MOEEL LAH FAKHOURY LLP
Shaffy Moeel (State Bar No. 238732)
2006 Kala Bagai Way, Suite 16
Berkeley, California 94704
Telephone:    (510) 500-9994
Email:        shaffy@mlf-llp.com

Attorneys for David Conerly

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DAVID CONERLY,<br><br>Defendant. | Case No.: 25-CR-220-JSW; 17-CR-578-JSW<br><br>DEFENDANT'S SENTENCING MEMORANDUM<br><br>Court:          Courtroom 5, 2nd Floor<br>Hearing Date:   February 10, 2026<br>Hearing Time:   1:00 p.m. |

## I.     INTRODUCTION

Mr. David Clayton Conerly appears before the Court having accepted responsibility for his conduct and with a record that, when viewed in full, reflects both serious mistakes and extraordinary progress. Mr. Conerly respectfully requests a sentence of 37 months' imprisonment on the new offense—the low end of the advisory guideline range—together with time served on the supervised-release violation, to be followed by a term of supervised release with conditions focused on treatment and stability.

The government urges the Court to impose a punitive, stacked sentence totaling 70 months, effectively treating this case as proof that rehabilitation has failed. But the record before the Court—including the information provided in this memorandum and multiple detailed character letters—demonstrates the opposite. Mr. Conerly was doing better than he ever had in his adult life. He suffered a relapse into alcohol and drug use, which led to a cascade of poor decisions. That relapse warrants accountability, but it does not erase years of progress, in and out of custody, nor does it justify abandoning the individualized analysis required by 18 U.S.C. § 3553(a).

## II.     THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

The offense conduct is serious. While intoxicated, Mr. Conerly drove recklessly, crashed his vehicle, and unlawfully possessed a firearm. He does not minimize this conduct. But the government's framing strips the incident of its critical context: this was a relapse-driven episode, not a return to a sustained pattern of criminal behavior.

As detailed in the mitigation report, substance use has long been intertwined with Mr. Conerly's poor decision-making, particularly during periods of emotional stress. The events of February 5, 2025 occurred after months of sobriety and compliance on supervision, during a period in which Mr. Conerly had built stability through employment, housing, and community service.

The government characterizes the offense as "disturbingly similar" to Mr. Conerly's past. But similarity alone cannot substitute for analysis. The relevant question under § 3553(a) is not whether the conduct resembles prior conduct in the abstract, but whether the sentence imposed is sufficient—and not greater than necessary—to address the actual risks and needs presented today.

### III.    HISTORY AND CHARACTERISTICS OF THE DEFENDANT[1]

### A.    FAMILY HISTORY

David's grandparents and parents came to the San Francisco Bay Area from Southern states during the first Great Migration. David's mother, Jeannie Pridgeon, was born in Little Rock, Arkansas, and moved to Oakland as a young child. Her father died before the move. Jeannie was the oldest of six children and helped raise her younger siblings. Her mother, David's grandmother, struggled with severe alcoholism. She often left the children home alone for weeks at a time. Jeannie collected and sold empty soda bottles to the store downstairs in their apartment building, in order to buy herself and siblings' food to survive.

David's paternal great grandmother, Ida Mae Mcrae, moved to Oakland from Louisiana. She lived in the Maxwell Park neighborhood. Her daughter, David's grandmother, also lived in Oakland. As a child, David visited her there, where she kept pigs and chickens in her back yard and killed chickens to eat when family came by.

### B.    CHILDHOOD

#### i.    David grew up inside the chaos of the crack epidemic, which interrupted his juvenile development

---

[1] The information provided in this section was compiled by court-appointed mitigation investigator Tay Wiles of Full Picture Justice and provided to the defense in the form of a mitigation report. That report is quoted in its entirety in this section.  In preparing her report, Ms. Wiles interviewed numerous people, including Mr. Conerly, Jeannie Pridgeon – his mother, Marquis Conerly – his brother, Mildred McKinney - former employer, Derries Bonadie - former employer, Earl Grays - former employer, and Lorenzo Grayson - community member, mentor, colleague.

DEFENDANT'S SENTENCING MEMORANDUM
*United States v. Conerly,* 25-CR-220-JSW; 17-CR-578-JSW

As a young child, David lived in a single-parent household with unstable housing and a community in the throes of the crack epidemic. David, his mother and two younger brothers moved many times between Oakland and South Berkeley in the late 1970's, '80s, and early '90s. The family survived on government assistance and they stayed with various extended family members on and off. David's father, David Clayton Conerly Sr., was incarcerated when David was very young, coming in and out of his life for brief moments throughout childhood. David's parents got into physical fights in the home and David saw his father using drugs. David Conerly Sr. died tragically of a fentanyl overdose many years later, and never had a strong relationship with David.

David was the oldest of three brothers, but he was shy. He was so shy that everyone always assumed Marquis was older. When meeting strangers, David hung back and let Marquis do the talking. David loved to play baseball and football at San Pablo Park in South Berkeley and enjoyed learning new things in school. David was moved around as a child, attending several different schools: preschool in East Oakland, and Emerson Elementary and Malcolm X Elementary in Berkeley.

The crack epidemic hit South Berkeley in the 1980s, while David was in elementary school. David saw countless family and community members around him become addicted. In fact, David remembers this time as when most people in his community were using drugs. People lost drastic amounts of weight and became numb to the world around them. As a child, David's maternal aunts were addicted to crack. When David was eight years old, his cousin hurt himself while playing outside, and with copious blood running down his face, the boy ran into his home for help. David saw his aunt lying stone-faced, high on crack, not responding while her son cried for help. The boys ran back outside and found another adult to take David's cousin to the hospital.

David's mother, Jeannie, did not have a long-term addiction to crack herself, but she bore the repercussions of her sisters' addictions. Drug dealers came regularly to the family apartment,

demanding Jeannie pay her sister's debts. Jeannie invariably satisfied them, for fear of physical violence. Once a group of drug dealers came to the house, threatening in course language to kill David's aunt, but she was not home. Young David witnessed these threatening interactions that put his mother and himself in frequent danger. These experiences interrupted any chance David had at a healthy juvenile development.

Kids and adults selling crack in the San Pablo Park neighborhood were ubiquitous. It was common knowledge that every Tuesday and Thursday, a Berkeley Police Department task force came through to crack down. Older boys and men selling crack roped in young children like David, and used them for their own means. They sold David and others in his age group weak drugs to try to sell, but they never made a profit.

Kids in the neighborhood idolized a community figure known as Frank the Bank, who was known as the most successful crack dealer around; he had nice clothes, cars, and money to spare. Frank the Bank handed out dollar bills to young children who asked for money. He also paid for the boys in the neighborhood to sign up for the football program, and he paid for kids to eat when they had no food at home. This was someone David and other kids looked up to, in place of other healthy role models that were none existent in their lives. David, along with other kids at the time, learned from figures such as Frank the Bank, that to succeed in life, selling drugs may be the only way. Frank appeared to have it all, when David had nothing.

David and his siblings grew up with few comforts. Kids at school called them dirty. His family rarely had enough food in the house, and sometimes no water to drink. David often ate bread with honey and sugar on top, all provided by government assistance. The government also provided powdered milk, but David couldn't stomach it. Any toys that David and his brothers did have at the house often went missing because their aunts sold them in order to buy crack.

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

███████████████████████████

**C.     ADOLESCENCE**

> **i.     David was pulled into the criminal behaviors of older males around him, and suffered traumas of violence and neglect by the California Youth Authority.**

David was first taken out of his mother's home and placed in the criminal justice system in sixth grade. He was sent to Juvenile Hall after stealing five dollars from another child at a Berkeley arcade. The academic level at juvenile hall was extremely low – 6th grade standards felt like 2nd grade to David. When he returned to the public school district, he had missed learning what his peers had been exposed to. Around this time, David's ability to focus on school began to waver.

In middle school, David was sent to Ralph J. Bunche continuation school in West Oakland. Instead of providing David with a stable and safe environment in which to heal from ongoing trauma and develop healthy coping mechanisms, this school environment was chaotic and dangerous. West Oakland was more violent than David had witnessed in Berkeley. Eleven-year-old boys drove their own cars to school. David's younger brother had his own car at that age as well. The academics were subpar: In seventh grade, David was being taught fractions in math class that were for fourth graders. When David had beef with another student, that student called their older male family members to chase him down after school. They told David's mother that if David didn't go back to Berkeley, they would kill him.

David was sent back to the California Youth Authority system after getting caught up with trying to sell drugs, as did his brother Marquis and so many other kids in their cohort growing up. The California Youth Authority was deeply traumatic. David was first housed at Preston School of Industry in Amador County, where he was exposed to violence, with kids beating each other in the face with bricks, locks or other makeshift weapons. From there, David was moved to N.A. Chaderjian Youth Correctional Facility, which housed youths up to age 25 and was just as violent. Once David witnessed another boy come into an open courtyard and start stabbing people; he stabbed one other boy repeatedly in the torso and neck.

While at N.A. Chaderjian, David earned several educational and vocational certificates for skills he continued to use into adulthood: Warehouse Operations, which includes basic warehouse stocking, computer literacy, Mitsubishi forklift operating, shipping and receiving, and file documentation. He also earned a certificate in janitorial services, including waxing floors and handling hazardous chemicals.

Next, David was transferred to El Centro Training Center with CYA, ten miles from the border of Mexico. Other kids at the facility tried to escape through the desert hills nearby but were always brought back. Once there was a riot, after which the facility required all the residents to stay in their cells, lying on their backs in bed for months on end, only permitted to stand up to use the toilet. These are experiences that David survived. They almost certainly had negative impacts on his juvenile emotional and cognitive development, and behavioral struggles for years to come.

David wasn't the only child in the family to get wrapped up in the criminal justice system at a young age. His brother Marquis also spent time in CYA facilities. Marquis also was in custody at the Arizona Boys Ranch for a time, before Alameda County pulled all of its youth sent there when a child returned with reports of abuse. The facility eventually closed in response to widespread claims of abuse.

After David's journey through the California Youth Authority system, he was placed in a group home for youths in San Francisco, then another in Berkeley. His home life throughout his entire adolescence was anything but stable.

## C.    ADVERSE CHILDHOOD EXPERIENCES

David is a survivor of almost all of what the Centers for Disease Control describes as Adverse Childhood Experiences, including parental neglect, domestic violence and substance abuse by parental figures, poverty, community violence and sexual assault.

To further understand David's circumstances, it is important to recognize the influence of the adolescent brain on any individual. As any adolescent, David required support and structure in order to navigate this maturation stage, but he had very little. The overwhelming trauma he experienced and its impact on his brain almost certainly interfered with his ability to make responsible decisions, and with his overall development.

The adolescent brain is particularly vulnerable to impulsivity and peer influences. The prefrontal cortex lobe, which is responsible for executive decision-making and thought processing, is not fully developed. Yet research shows that it is not in any way uncommon for adolescents to grow out of their impulsivity and into rational adults. Despite his traumatic upbringing, David has grown into a remarkable, emotionally intelligent adult with a growing understanding of the causal factors of his past offenses.

## D.    ADULTHOOD AND TRANSFORMATION

David suffered a major trauma when in his 20's. He witnessed a gruesome murder of his first cousin, Mario Jackson, who was like a brother to him. David was at his aunt's home in South Berkeley with Mario, when a gunman chased them into the backyard and back to the front yard. David's aunt locked herself inside, in fear for her life. Mario was shot multiple times, after which David screamed for help and tried to revive his cousin. This trauma impacted David in ways he had

DEFENDANT'S SENTENCING MEMORANDUM
*United States v. Conerly,* 25-CR-220-JSW; 17-CR-578-JSW

never experienced. He became depressed and suffered emotional wounds that his family and community still talk about to this day.

Throughout David's time in prison, he continued to seek self-improvement and education whenever he could. David attended courses at Dewitt Nelson High School while incarcerated, Ella Hancock College and Chabot College through Santa Rita Jail, and Skyline College. He worked for a season on the California Department of Corrections and Rehabilitation fire-fighting crew in the Sierra Mountains.

David's first employment outside a jail or prison was in warehousing at the Goodwill on Mission Street, and later Fifth and Brannan Streets in San Francisco. David was in his mid-30s at the time and enjoyed the work. The job included bailing clothing, up to 500 pounds per bale in a compression machine, forklifting and moving the bales for transport to other Goodwill locations. David also worked receiving donations to Goodwill.

E.    RECENT WORK EXPERIENCE AND POSITIVE LIFESTYLE

During David's most recent stint in civilian life, he lived for 18 months in a halfway house on Turk Street in the Tenderloin of San Francisco[2]. While there, he maintained multiple jobs. David's employers speak highly of him as a motivated and reliable employee. David worked as an instructor for Performing Solutions, an organization that trains individuals in commercial truck driving in the Bay Area. David completed the course and obtained his truck driving license. Then he started volunteering, and the organization's founder, Earl Grays, asked him to come on as a full-time employee. Over a year, David trained up to 100 formerly incarcerated individuals, veterans or other underserved individuals in need of a second chance. After a year, he took a job with another trucking

---

[2] Although Mr. Conerly's time on supervised release began in July of 2024, he was released early by the Bureau of Prisons to serve the remainder of his term of incarceration at the halfway house.

DEFENDANT'S SENTENCING MEMORANDUM
*United States v. Conerly,* 25-CR-220-JSW; 17-CR-578-JSW

company. Earl Grays describes David as an always positive person and a great employee. Mr. Grays would hire David again upon release.

David also worked for Bird's Scooter under supervisor Derries Bonadie. David's position was to move public scooters around the city as needed and trouble-shoot mechanical issues. Derries stated in an interview that David was always reliable, was smart and capable and one of his best workers. David was good to work with and always offered to help other workers as needed.

During this time, David worked to secure independent housing. Hospitality House of San Francisco assisted him in securing an apartment to rent in Oakland. The day David was incarcerated at Santa Rita for his current case, was also the day he was scheduled to move into the apartment unit he had been approved for at 1660 Wood Street in Oakland. David also secured a job with the City of Berkeley to help maintain public parks and clean up graffiti. David interviewed for the job and said that he did not have experience cleaning graffiti, but was eager to have the job. He hoped to move into more varied work with Parks & Recreation in the future. David was incarcerated for his current charges and never had a chance to begin.

In recent years, David has also become passionate and active in helping underserved youth find opportunities in life that he never had, specifically in the South Berkeley neighborhood he grew up in. Before his recent incarceration, David was regularly helping to coach kids ages 5 to 14 through Berkeley Jackets Football, a nonprofit that reaches 150 Black and Latino underserved youth in the greater Bay Area, and is based at San Pablo Park. David's childhood friend Lorenzo Grayson founded and runs the program. Lorenzo, ten years David's senior, saw the crack epidemic rip through the San Pablo Park neighborhood in the '80s, while he and David were kids. Lorenzo believes David's lifelong struggle with incarceration is a reflection of the environment he grew up in and not at all uncommon for their cohort. Lorenzo acted as a sort of big brother that David never had, and still wants to be in David's life today.

DEFENDANT'S SENTENCING MEMORANDUM
*United States v. Conerly,* 25-CR-220-JSW; 17-CR-578-JSW

9

David gave talks to the kids in the Jackets program about his own experiences and life choices. He also volunteered at the snack bar during game days and any other job that needed doing. David also joined multiple "peace walks" that Lorenzo Grayson regularly organizes in the South Berkeley community to support non-violence in the streets. Lorenzo was shocked and saddened to know that David had been incarcerated again, due to the fact he was such a positive influence in the community. Lorenzo has seen David grow since childhood, and notices a calmness and maturity at this stage in David's life in contrast to his younger self that was focused on surviving the streets. Today David is less of a follower and shows positive leadership. Lorenzo noticed David had stopped smoking or drinking, and Lorenzo was and still is, proud of him.

More recently, for the past nine months while at Santa Rita Jail, David has been a pod worker helping deputies control the other prisoners in his pod. David organizes others to keep the pod clean and orderly, organize food trays for meals, and diffuse arguments that inevitably arise between other men in the pod. When someone has an interpersonal problem, David sits down and talks with them. David's problem-solving abilities and calm demeanor are a benefit to those around him.

David is also currently in the construction program at Santa Rita Jail, where he is earning related certificates. After completing the program, and after release from jail, prisoners have the opportunity to be placed with union jobs in San Ramon via Northern California District Council of Laborers and the Laborers Pacific Southwest Region, Local 304.

## F.    HOPES FOR THE FUTURE

David regularly reflects about his grandparents not attending school and his great-grandparents' experiences suffering from decades of intergenerational trauma. But he has hope for the future.  His daughter is now starting a full-time job in Human Resources for Safeway and is a graduate of University of California Davis.

Last year David had the opportunity to travel outside the Bay Area for the first time, not through incarceration. He traveled to Southern California and took a ferry to Catalina Island. David went parasailing and saw whales and dolphins for the first time. These are experiences David never dreamed of as a child. David feels he is just now beginning to see his place in the world and he is determined to be a positive member of society upon his release.

While inside, David speaks to his daughter and mother and other members of his community who have a positive influence on his mental health. David has expressed deep remorse for the harm he has caused and takes responsibility for his actions, recognizing the lasting impact on others. Looking ahead, David has set meaningful goals for life beyond incarceration. Two of David's recent employers stated in interviews that they would like to have David back at his job upon his release; the third employer was not available by phone in time for this memorandum.

## IV.    THE SUPERVISED-RELEASE VIOLATION SHOULD NOT DRIVE A PUNITIVE SENTENCE

Probation's Petition for Warrant (Form 12) confirms that all three alleged violations arise from a single incident on February 5, 2025. Dkt. 157.  The petition alleges that Mr. Conerly violated conditions of supervised release by (1) committing new state-law offenses, including possession of a firearm, resisting arrest, possession of a controlled substance, and driving under the influence; (2) possessing a firearm and ammunition; and (3) unlawfully possessing a controlled substance. Each allegation is derivative of the same relapse-driven episode.

Notably, neither the Form 12 nor Probation's Violation Memo contain any individualized analysis of the § 3553(a) factors.  They do not contain any assessment of Mr. Conerly's overall performance on supervision and do not contain any discussion of the substantial rehabilitative strides he had made since supervision began on July 18, 2024. Instead, the petition and violation memo mechanically classifies the conduct as a Grade B violation and recites the advisory range (8-14

DEFENDANT'S SENTENCING MEMORANDUM
*United States v. Conerly,* 25-CR-220-JSW; 17-CR-578-JSW

months, with a statutory maximum of 24 months) without addressing whether additional incarceration is necessary to serve the purposes of supervised release.

That omission matters. Revocation is intended to sanction a breach of trust, not to impose duplicative punishment for the same conduct already addressed by the new criminal sentence. Here, the breach of trust is real, but it must be understood in context: Mr. Conerly had been compliant, employed, and stabilizing for months before a relapse into alcohol and drugs precipitated this conduct. Probation's Violation Memo does not grapple with that reality, nor does it explain why stacking additional consecutive custody would advance deterrence, rehabilitation, or public safety.

Because the violation conduct is entirely coextensive with the new offense conduct, and because it stems from a single relapse episode rather than a pattern of defiance, time served on the supervised-release violation adequately accounts for the breach of trust. Anything more would amount to punishment untethered from the individualized, forward-looking analysis that § 3583(e) and § 3553(a) require.

**V. THE GOVERNMENT'S REQUEST UNDERMINES THE PURPOSES OF § 3553(a)**

The government emphasizes deterrence and protection of the public, but its recommendation assumes—without evidence—that longer incarceration will achieve those goals. The record suggests otherwise.

- Specific deterrence: Mr. Conerly has already demonstrated that structure, employment, and treatment reduce his risk far more effectively than prolonged incarceration.

- Public safety: Every credible witness interviewed by the mitigation investigator describes Mr. Conerly as less dangerous, more reflective, and more accountable than at any prior point in his life.

- Respect for the law: A sentence that recognizes both accountability and rehabilitation promotes respect for the law far more than one that appears purely punitive.

The government's proposed 70-month sentence would sever Mr. Conerly from the very supports that have proven effective and would discard the substantial investments already made by the community, employers, and re-entry organizations willing to continue supporting him upon release.

## V.    A LOW-END GUIDELINE SENTENCE WITH TIME SERVED ON THE VIOLATION IS SUFFICIENT

A sentence of 37 months, together with time served on the supervised-release violation, appropriately balances the seriousness of the offense with the mitigating factors present here. It reflects accountability, avoids unwarranted disparity, and preserves the possibility of continued rehabilitation through supervised release with treatment-focused conditions.

This sentence recognizes a hard truth that courts increasingly acknowledge: relapse is often part of recovery, particularly for individuals with deeply rooted trauma histories. Punishing relapse as moral failure, rather than addressing it as a clinical and social reality, risks undermining public safety rather than enhancing it.

## VI.    CONCLUSION

Mr. Conerly stands before the Court not as a man who rejected opportunity, but as one who stumbled after making good progress. The Court is not asked to excuse his conduct—only to sentence him as a whole person, consistent with § 3553(a).

For these reasons, Mr. Conerly respectfully requests that the Court impose a sentence of 37 months' imprisonment on the new offense, time served on the supervised-release violation, and a term of supervised release designed to support continued sobriety, stability, and lawful conduct.

Dated:  February 3, 2026                    Respectfully submitted,

                                            *s/ Shaffy Moeel*

                                            _____
                                            Attorney for Defendant

DEFENDANT'S SENTENCING MEMORANDUM
*United States v. Conerly,* 25-CR-220-JSW; 17-CR-578-JSW

13

_____

David Conerly

# Exhibit A



January 16, 2026

**Re: David Conerly BAM674**

I am Mildred McKinney, Cofounder/Executive Director of Open Gate, Inc.  Open Gate is an Oakland, CA based certified 501(c)(3) non-profit organization dedicated to supporting and facilitating formerly incarcerated individuals through college education to graduation and vocational training.

Open Gate, Inc. works closely with our students at every step of the matriculation and enrollment process.  We also provide wrap-around support, including tutoring, peer mentoring, and substance abuse workshops until graduation and beyond. We have a 90% college retention rate and a 2% recidivism rate.

We met Mr. Conerly in September of 2023 when he was attending truck driving school in Oakland. After successfully completing his Class A driver's course, he became an instructor at the truck driving school he attended.  In October 2024, after numerous visits to the site and seeing his natural talent with the students, we hired him to become a mentor to our students who are currently in truck driving class.  We will always be open to offering him employment with our organization.  He has done an amazing job as a mentor for other formerly incarcerated students providing the proper mindset and determination to become successful students.  I know he has so much positivity to offer the world. His presence in the reentry community is very well recognized, and I feel he will continue to be a positive influence on so many others' lives.

Sincerely,


Mildred McKinney
Co-founder/Executive Director

*From Incarceration to GRADUATION!*

P.O. Box 22812 - Oakland, CA 94609 • www.opengateog.org



To the honorable Judge, the court system, and all relevant parties,

My name is Earl Grays, and I am the CEO of Performing Solutions, a respected vocational, job placement, and housing assistance program. Since our inception in 2021, Performing Solutions has achieved an impressive success rate of over 90%. We primarily serve re-entry men and women who are transitioning from prison, as well as the homeless, underserved populations, and individuals seeking career changes. Our commitment to making a positive impact in the community is unwavering.

We are proud to collaborate with various organizations, including the Department of Rehabilitation, Federal and State Parole/Probation, Prison Systems, and many others, to enhance our support and outreach.

Today, I wish to provide my character assessment of David Conery, a student who joined my program in August 2023. From our very first interaction, it was clear that David is exceptionally bright and possesses a strong desire to transform his life. His history of incarceration, which began in his youth, does not define him. Instead, it highlights his resilience and determination to change.

I conducted David's intake and orientation, and it became evident that he was committed to making significant changes in his life. He excelled in my courses, achieving a perfect score of 100%, and I can provide documentation to support this. Additionally, David obtained his CDL certification through our program, which led me to hire him as an instructor. In this role, he has positively impacted over 100 students, helping them achieve their own CDL certifications and secure employment.

It's also worth noting that during this time, David managed to hold a second job with a commercial vehicle company. His dedication and work ethic are commendable. Recently, David

expressed a desire to pursue a position as an over-the-road commercial truck driver, and he has taken the necessary steps to achieve that goal.

 Moreover, David has made tremendous strides in his personal life. He successfully secured his own housing, built good credit, purchased his own vehicle, and reestablished a meaningful relationship with his daughter, which speaks volumes about his character.

 David Conery has demonstrated that he is a capable and motivated individual who deserves a second chance in society. He has proven himself to be a productive citizen with much to contribute to his community. I strongly believe that he is a humble, yet remarkable man who is ready to give back.

 Thank you for your time and consideration.

 Sincerely,

Earl Grays, CEO
Performing Solutions
www.performingsolutions.org

*Earl Grays*



January 30, 2026

To whom it may concern,

This letter is regarding David Conerly. David has participated in the Young Lives Matter program since January 2025 and is still a member of our program.  H e  has proven himself to be dedicated, responsible, and a role model to youth in our program. David is an active volunteer in our community conflict resolution activities, Voices Against Violence program, our youth football program, the Berkeley Jr Jackets, and our Peace Walk for the Berkeley community.
As a vital leader of our youth programs, he follows through commitments, carries himself with respect, and respects those around him.  The young men in our programs look up to David as he consistently shares his life experiences and valued learning with them in our larger events, as well as smaller activities. We are extremely proud to have a gentleman of his caliber volunteering and participating in our programs; he has proven himself as a valued addition to our organization.

Sincerely,

**Lorenzo Grayson**

Founder/President

**Young Lives Matter Foundation**

INCORPORATED

Non-Profit Tax Exempt Charitable Entity
EIN NO. 88-2349661

 Outlook

---

**Re: David Conerly**

---

**From** Latasha Brooks <latashareneebrooks@gmail.com>

**Date** Mon 2/2/2026 9:54 PM

**To** Shaffy Moeel <shaffy@mlf-llp.com>


To Whom It May Concern,

I am writing this letter in support of my cousin, David. I have known David my entire life (38 years) and I feel it is important to share who he truly is beyond his current circumstances.

David has always been an active and devoted cousin. Throughout my life he has consistently shown up for me with encouragement especially during difficult moments. He has a way of reminding me to focus on brighter possibilities and not give up even when things feel overwhelming.

One of the most meaningful ways to me that David has shown his character is through the time and care he has given to my 4year old son, who is autistic. David would regularly come over to help me offering support not only as family but as a positive male role model in my son's life. He was patient, present, and genuinely invested in being there for him. That kind of consistency and compassion speaks volumes about who David is at his core.

Before his incarceration, I witnessed a significant and positive transformation in his life. He loved working his two jobs and was there everyday all while living in a halfway house demonstrating responsibility, discipline, and determination to better himself. He was taking real steps toward independence and stability and was preparing to move into his own apartment a week before his arrest. This was not someone going backwards but someone actively working to build a better future for himself

Unfortunately, David has never received the proper support, therapy, or guidance needed to address the challenges rooted in his upbringing. I truly believe that many of the struggles he has faced could have been different if he had been given the right tools and help earlier in life. Much of his time has been spent incarcerated which has made it difficult for him to fully move forward despite his efforts.

Since his release prior to this incarceration I personally watched David make a complete turnaround in his mindset and behavior. He showed growth, accountability, and a genuine desire to live a productive life. That change was real and it mattered to me and everyone who loves him.

David is not a lost cause. He is someone who responds to structure, support, and opportunity. With the proper resources and guidance I believe he can continue on a positive path and be a contributing member of society. Even while being incarcerated he's actively participating in a construction class. He's always working on ways he can inhance his future.

Thank you for taking the time to consider this letter and for allowing me the opportunity to speak on my cousins behalf.

Regards,

Latasha Brooks

